**O**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| JAMES DANIEL FUENTES, | ) | CASE NO. ED CV 09-01041 CJC (RZ) |
| Petitioner, | ) | |
| | ) | REPORT AND RECOMMENDATION |
| vs. | ) | OF UNITED STATES MAGISTRATE |
| | ) | JUDGE |
| FERNANDO GONZALEZ, Warden, | ) | |
| Respondent. | ) | |

Pursuant to 28 U.S.C. § 636 and General Order 05-07 of the United States District Court for the Central District of California, the undersigned submits this Report and Recommendation to the Honorable Cormac J. Carney, United States District Judge. The undersigned recommends that the Court grant the Petition for Writ of Habeas Corpus.

**I.**

**BACKGROUND AND CLAIMS PRESENTED**

Petitioner James Daniel Fuentes presents a single claim, that insufficient evidence supports his conviction of aiding and abetting a drive-by shooting. The jury heard that Petitioner (1) was the shooter's fellow gang member who, according to a gang expert, thus could be expected to be "on board" with the shooter's murderous plans; (2) leaned back in his passenger seat when the driver reached rightward across the interior

of the car to shoot at the victim; and (3) never took action to prevent the crime or to indicate his disapproval thereafter, and instead maintained a warm friendship with the killer. A San Bernardino County Superior Court jury thought this sufficed, and the state courts agreed on appeal. Petitioner, who is serving a prison sentence of 50 years to life, maintains that the decision violates the Constitutional requirement that he not be convicted without due process of law. The Court agrees.

## II.
## STANDARD OF REVIEW

The Court assesses the Petition under the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), which provides in part:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254.

To resolve Petitioner's claim, the Court will examine the explicated decision of the California Court of Appeal rejecting the claim on direct review, *see* Lodgment 5,

1  rather than the California Supreme Court's subsequent "silent" denial of further direct
2  review. *See* Lodgment 7. "[W]here there has been one reasoned state court judgment
3  rejecting a federal claim, [federal habeas courts should presume that] later unexplained
4  orders upholding that judgment or rejecting the same claim rest upon the same ground."
5  *Ylst v. Nunnemaker*, 501 U.S. 797, 803, 111 S. Ct. 2590, 115 L. Ed. 2d 706 (1991).

6
7                                    **III.**
8                              **THE CRIMES**

9           In affirming, the California Court of Appeal summarized the underlying
10 factual findings. Petitioner has failed to rebut these findings with clear and convincing
11 evidence. The findings therefore are presumed to be correct. 28 U.S.C. § 2254(e)(1);
12 *Bragg v. Galaza*, 242 F.3d 1082, 1087 (9th Cir. 2001) (presumption applies to findings of
13 state appellate courts as well as trial courts). The appellate court's extensive summary of
14 a lengthy trial is as follows:

15
16                          [INTRODUCTION]
17           On June 24, 2003, fellow Westside Verdugo (WSV) gang
18           members defendant Melecio Junior Reyes (Reyes) and defendant
19           James Daniel Fuentes (Fuentes) drove Reyes's Thunderbird past
20           [victim] Francisco Ferreira. Reyes, who was driving the car,
21           stopped, quickly reversed, and pulled up next to where Francisco
22           was working on his car. Reyes grabbed a gun, reached across
23           Fuentes, and shot Francisco. Francisco died as a result of the
24           gunshot wounds, and defendants were convicted of his murder,
25           in the first degree.
26           One year prior to this incident, Reyes had been across the
27           street from Francisco's house with a group of people. Abraham
28           Lopez rode his bicycle past the group. Someone in the group

yelled, "Westside Verdugo," and then Reyes shot at Lopez, hitting him in the leg. Ector Ferreira, Francisco's brother, confronted Reyes about shooting his friend Lopez. Ector told Reyes that Reyes might as well shoot him if he was going to shoot his friend. Reyes then shot Ector in the face. Reyes was convicted of the attempted murders of both Ector and Lopez. These shootings were found to be gang related.

. . .

## FACTUAL BACKGROUND

A.    *Shooting of Francisco*

On June 24, 2003, Megan Kahookele lived with her boyfriend Francisco at his house located at 218 West 24th Street in San Bernardino. About 4:00 p.m. that day, Francisco was in front of the house working on his car. Kahookele went outside to check on her son and Francisco's son. She observed a "burgundy" Thunderbird drive westbound on 24th Street. The car drove past Francisco and then stopped about two or three houses down from their house. Francisco immediately told Kahookele to get his brother, Ector, who was inside the house.

Ector was in his room when he heard Kahookele scream very loudly that Francisco was in trouble. Ector ran to the front door of the house.

Kahookele observed the Thunderbird quickly reverse, heard the tires screeching, and then saw it pull up next to Francisco. The Thunderbird stopped in front of Francisco. There were two male Hispanics whom she later identified as Reyes and Fuentes in the car. Someone in the car started shooting at Francisco. Kahookele made eye contact with the

passenger, who was leaning back during the shooting. One of the defendants was wearing a flannel shirt, and the other was wearing a white tank top. The Thunderbird took off westbound at a high rate of speed.

Ector also observed a "red" car pull up next to Francisco. Reyes, whom he identified as Soldier Boy, was in the passenger's seat. Reyes said to Francisco, "What's up?" The driver said nothing. Francisco waved his hand at Reyes in response. Reyes reached down toward his lap and grabbed a gun. Reyes then began to shoot at Francisco. Ector heard three gunshots. Francisco fell to the ground and began choking on his own blood.

Maria Medina lived several houses down from Francisco. She also observed what she indicated was a red Thunderbird stop and reverse back to where Francisco was working on his car. The male driver of the Thunderbird pulled out a gun, the passenger leaned back, and the driver shot at Francisco. Medina recalled that the license plate frame on the Thunderbird was red. Medina believed the driver was wearing a white tank top. Both occupants were Hispanic, with shaved heads, between the ages of 16 and 20 years old.

Jose Martinez was in his driveway down the street. Martinez observed a red Thunderbird drive by, stop, and then reverse. He lost sight of the car but heard someone yelling, after which shots were fired. The Thunderbird then sped away.

WSV gang member Melquiades Rojas lived with his mother Denise Rojas across the street from the Ferreira house. His brother, Martin, also of WSV, visited frequently. On

June 24, 2003, just prior to the shooting, Reyes (whom Melquiades knew as Soldier) and Fuentes came to the Rojas house asking for Martin. Although Martin was inside the house, Melquiades lied and told them he was not there.[FN2] Martin had told Melquiades to lie for him.

> FN2. Denise recalled that a person called Soldier had given Martin two black eyes a day or two earlier.

Denise arrived home at this time to find a car parked in her driveway. She did not recall the type of car. Denise went inside the house and saw two Hispanic males (whom she could not identify at trial). Both her sons were also in the house.

Approximately 10 seconds after Reyes and Fuentes left the Rojas house, Melquiades and Denise heard gunshots. Melquiades also heard tires screeching.[FN3] Denise, Melquiades, and Martin immediately left in Denise's car. Denise could not identify the photographs of Reyes and Fuentes as being the two men who were at her house the day of the shooting. She also could not identify a photograph of the Thunderbird as the one at her house that day.[FN4] Melquiades was afraid when he heard gunshots because he claimed that persons in the Ferreiras' house frequently shot at his house.

> FN3.  Prior to trial, Melquiades told officers that defendants were driving a red Thunderbird, but he could not identify the car at trial.  In addition, prior to trial, Melquiades told Detective Kokesh that defendant Reyes was in the driver's seat when they left the Rojas's house.

> FN4.  A female came to Denise's house prior to the trial and told Denise not to testify.  Denise did not call the police immediately.  Denise admitted that she was scared to testify. She stated that she was bipolar and suffered from schizophrenia, which affected her memory.

San Bernardino Police Officer Michael Madden arrived at the scene of the shooting after hearing the call about the shooting that went out at 4:02 p.m. Francisco was still lying on the ground bleeding. Kahookele told Officer Madden that the suspects were two Hispanic males who were driving a red Thunderbird. Ector gave the same description of the suspects and the vehicle.

At 4:14 p.m., Detective Bret Baumgartner, then a patrol officer, observed the Thunderbird in an area approximately five to 10 minutes from the shooting location and initiated a traffic stop. The Thunderbird initially began to accelerate, which made Detective Baumgartner believe it was not going to yield to the traffic stop, but it eventually stopped. Reyes was in the driver's seat; Fuentes was in the passenger's seat. The license plate frame on the Thunderbird was red. The Thunderbird was registered to Reyes's mother.

Defendants were ordered out of the car and handcuffed. Reyes was wearing a white tank top; Fuentes was wearing a short-sleeved brown shirt with a pattern. Fuentes initially gave officers a false name and birth date.

A .22-caliber shell casing was found on the right rear floorboard of the car. An ammunition clip for a .22-caliber rifle was found in the console area of the Thunderbird. It did not contain any live rounds. A live shotgun shell was also in the center console. A loaded shotgun was found in the trunk of the Thunderbird, hidden underneath some clothes. Other live shotgun shells were found in the trunk. A photograph found in the trunk depicted several individuals flashing gang signs.

At a field show up, Kahookele identified both defendants and the car as being involved in the shooting. Ector identified Reyes as the shooter and identified the car. He identified Fuentes from the shirt Fuentes was wearing. Martinez was also taken to the field show up. He identified the car as the one involved in the shooting, but he could not identify the defendants.

Gunshot residue tests performed on Francisco and Ector were negative. Gunshot residue tests conducted on both defendants were positive, which meant they had either shot, handled, or been in close proximity to a gun when it was fired.

There were no spent shell casings found in the street or anywhere near the location where the shooting occurred. Francisco's residence was searched, and no weapons were found inside. The bullets found in Francisco's body were consistent with the casing found in the Thunderbird, but no tests were conducted to determine if they matched. All three bullets recovered from Francisco's body were .22 caliber. Witnesses identified the weapon used as a small-caliber handgun.

Ector had shot a gun from inside his house one week prior to Francisco's shooting. Ector thought someone was hiding behind a tree in his yard and was going to harm him because whoever it was kept yelling his name. He thought it might be Martin, but no one was outside when he went to look behind the tree.

At the police station, Reyes told officers that his gang moniker was Soldier.

B.   *Shooting of Ector and Abraham Lopez*

Around 1:00 a.m. on July 2, 2002 (about a year prior to Francisco's murder), Ector called Abraham Lopez and invited him over for a beer.  Lopez rode his bike to Ector's house.  Lopez's cousin, Israel Medina, followed behind him.  When Lopez turned onto Ector's street, he immediately saw a group of people in front of the Rojas house. Lopez heard a male voice yell, "West Side, mother-fucker."  Lopez was not a member of a gang.  In a matter of seconds, Lopez was being shot at.  Lopez went to the ground and started crawling to safety.  He hid behind a parked car.  Israel also immediately went to the ground; he believed he heard more than five gunshots.

As Ector was waiting for Lopez, he heard gunshots in front of his house.  Ector went outside and saw Reyes standing by a tree near the Rojas house, shooting at Lopez.  Ector confronted Reyes and said, "That's my friend."  Ector told Reyes that he had "messed up," that Lopez was like a brother to him.  Ector was very upset.  He told Reyes, "You shoot at him, shoot at me, too."  Reyes responded, "All right," and shot at Ector's face.  Ector was within eight feet of Reyes.

Lopez and Israel ran across the street to Ector's house and hid behind another car.  Lopez then realized that he had been shot in the leg.  The bullet had gone through Lopez's thigh.  Reyes ran to the back of the Rojas house after the shooting.

Melquiades was home at the time of the shooting.  They were having a party.  Reyes was at the party.  Blood was found around both the Ferreira and Rojas residences.

Lopez had to walk on crutches for a month and then with a cane for two months. Ector spent one month in the hospital and almost died. He had a trachea tube in his throat as a result of the shooting and would have it the rest of his life. The bullet remained lodged in his chin. Ector told Israel after he got out of the hospital that Soldier Boy had shot him. Israel did not know who Soldier Boy was.

Ector did not tell the police that Reyes had shot him until after Reyes shot Francisco. Ector told the police he intended to take care of his situation himself but did not have the "balls" to kill Reyes. Ector denied that he thought Martin shot him.

Ector claimed he had been a WSV gang member but had gotten "jumped out" which involved fighting with other gang members; he had been out of the gang at the time he was shot. Ector claimed that the gang would not come after a former member once he was jumped out. Lopez was not a WSV gang member. Ector's street was in WSV territory.

Lopez had an encounter with WSV gang members about two months after the shooting. They accused him of having a gun and shooting first the night that he was shot.

C.    *Gang Testimony*

On December 19, 1998, Reyes told a police officer he was a member of the Mt. Vernon gang, which was another name for the WSV gang, and that his gang moniker was Soldier. He did not appear to have any tattoos at that time. On August 15, 2002, Reyes identified himself to an officer as a WSV gang member with a moniker of Soldier. Reyes had a "Verdugo" tattoo, along with an "IE" tattoo. On March 11 and May 29, 2003, Reyes

admitted to two different officers that he was a WSV gang member and that his gang moniker was Soldier. At these times, Reyes had an additional tattoo of the words "if they only knew" on his stomach.

On June 27, 2002, Fuentes told an officer that he was an active WSV gang member. Fuentes claimed he had been jumped in by four WSV gang members when he was 11 years old.

Both defendants admitted when they were first jailed for this incident that they were WSV gang members. Reyes told officers at the jail that his moniker was Soldier.

On October 24, 2005, several letters and other items were collected from Fuentes's jail cell. Numerous letters were from Reyes and other WSV gang members. There were numerous items found that contained gang graffiti. Letters and other items were also found in Reyes's cell.

Detective Marco Granado testified as a gang expert. The WSV territory consisted of all of western San Bernardino. WSV gang members commonly engaged in homicides, robberies, witness intimidation, drug trafficking and other crimes. Between 2000 and 2005, several WSV gang members were convicted of murder, attempted murder, and assault with a firearm.

It was Detective Granado's opinion that Reyes was an active member of the WSV gang, specifically the 7th Street Locos clique. He based his opinion on Reyes's own admissions, his tattoos, and items taken from his jail cell. The letters taken from his cell were from other known WSV gang members, and

Reyes was referred to as Soldier.  Detective Granado indicated that Reyes's continuing addition of WSV tattoos showed his increasing status in the gang.  The moniker Soldier showed that Reyes was a hardcore member of the gang.

Detective Granado had reviewed gang cards and looked at the items found in Fuentes's jail cell.  In the documents received from Fuentes's jail cell, several items had WSV gang graffiti.  Fuentes had referred to himself as Little Chato, which Detective Granado believed was a gang moniker.  Fuentes also had referred to himself in one of the letters as "one of Verdugo's finest," showing he was a member of the gang.  Fuentes had written several letters to Reyes and called himself "Your Little Homie."  The fact that Fuentes had no gang tattoos was not significant, because some gang members do not want to be classified as gang members and therefore subject to stiffer penalties.  Detective Granado believed Fuentes was an active member of the WSV gang based on the documents found in his jail cell, the gang cards, and the instant crimes.

In Detective Granado's opinion, Reyes was higher in the gang than Fuentes.  Fuentes was an "up and comer" in the gang.

Detective Granado had reviewed the reports from both the 2002 shooting of Ector and Lopez and the 2003 shooting of Francisco.  It was his opinion that the shooting of Lopez and Ector benefitted the gang.  He based his opinion on the fact that gang members gain status by committing crimes, the more violent the better.  It also showed that the WSV gang was trying to establish some type of turf or neighborhood through intimidation.

As for the shooting of Francisco, Detective Granado also believed it was done to benefit the gang.  He based his opinion on the fact that Reyes had been the shooter in the prior incident at the same location, which showed a pattern of his committing gang-related type shootings in the area.  It also benefitted Fuentes because gang members rarely commit crimes by themselves.  It also would be a form of disrespect for Reyes to commit the shooting without Fuentes's knowledge.  Further, a driver of a vehicle in a drive-by shooting gains status by simply being the driver.   A passenger in a vehicle from which a shooting is committed gains status for the crime.

Detective Granado also based his opinion that this was a crime committed to benefit the gang based on Denise advising him that Reyes and Martin had been in a fight a few days prior to the shooting.  Reyes had given Martin two black eyes.  Martin did not fight back because Reyes's friends had produced handguns during the fight.  When Denise saw Reyes and another gang member at her house on the day of the shooting, she presumed that they were there to harm Martin.

The prosecution presented a hypothetical matching the facts of the 2002 and 2003 shootings.  Detective Granado believed that that hypothetical would benefit the gang because the gang member was willing to go back to the same location a year later to commit or further his gang's activity and would personally gain respect due to the fact that he was willing to put in work or do an assault for the gang in the same area.  In Detective Granado's opinion, a gang member would not go back to an area where he previously had been involved in a shooting

or assault without being armed and without fellow gang members. The passenger, with knowledge of the prior shooting in the same area, would be "on board" with whatever was going to happen. He based his opinion on his experience with dealing with gang members and investigating gang crimes.

Detective Granado also indicated he believed Fuentes knew what was going to happen the day of Francisco's shooting based on the letters written from jail showing respect for Reyes. Again, Detective Granado opined that if a gang member committed a crime in the presence of a fellow gang member without the other person knowing, it would be a sign of disrespect. The correspondence found in the jail cells of the defendants between each other showed they were working together.

As for the shooting of Ector, by challenging Reyes, Ector was being disrespectful, especially since Ector was in the WSV gang. Any type of disrespect could not go unanswered.

Detective Granado believed the 2002 shooting was done to promote, further, or assist the criminal conduct by the gang members based on the yelling out of "WSV" prior to the shooting to alert people in the area that the shooting was being committed by gang members. Detective Granado believed that the shooting of Francisco was a carry over from the prior shooting. There was still unfinished business by the gang; it was just a continuing act to further the gang's involvement in gang activity in the general area.

Detective Granado had no information that Francisco was a gang member. The area of 24th Street and Verdugo was not

established by any gang.  However, it appeared that WSV was trying to set up the area as gang territory.

### D.    *Defense*

Fuentes presented the testimony of Tonja Vargas, his mother, that he did not know how to drive.  Reyes presented the testimony of Jeffrey Wagner.  On the day of Francisco's shooting, Wagner was outside playing basketball at a house located down the street from the shooting.  About 4:00 p.m. he saw a car drive by but claimed he did not recall the color.  After seeing the car, he heard screeching tires and gunshots.  He then saw a small car, which he thought was a Geo Metro, driving fast on the next street.  This car was different from the one he first saw drive by him.

Wagner also testified he attended the field show up and identified the car in which defendants were detained as the one he saw and also identified Fuentes.  He could not identify them at trial.

It was stipulated that Wagner told a police detective immediately after the shooting that the car he first observed was a red Thunderbird containing three male Hispanics, all between 16 to 20 years old.  Martinez could not be located for trial.

Lodgment 5 at 3-14.

# IV.

## SUFFICIENCY OF THE AIDING AND ABETTING EVIDENCE

Petitioner asserts that there was insufficient evidence to prove he aided and abetted Reyes's murder of Francisco.  The state courts rejected this claim on direct review.

A.    **Applicable Law**

1.    **Federal habeas review of insufficient evidence claims, generally**

The standard for evaluating a constitutional claim of sufficiency of the evidence is whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979) (emphasis in original). All evidence must be considered in the light most favorable to the prosecution. *Id.* This standard is applied to the substantive elements of the criminal offense defined by state law. *Id.* at 324. This standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id.* at 319.

To establish sufficient evidence, the prosecution need not affirmatively "rule out every hypothesis except that of guilt." *Id.* at 326. Moreover, a reviewing court "faced with a record of historical facts that supports conflicting inferences must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Id.* at 326. Even where evidence is "almost entirely circumstantial and relatively weak," it may be sufficient to support a conviction. *Jones v. Wood*, 207 F.3d 557, 563 (9th Cir. 2000). On habeas review, moreover, reviewing courts "apply the standards of *Jackson* with an additional layer of deference." *Juan H. v. Allen*, 408 F.3d 1262, 1275 (9th Cir. 2005).

2.    **Aiding and abetting murder, under California law**

To survive a *Jackson* challenge, the record must reflect sufficient evidence to allow a reasonable factfinder to conclude, beyond a reasonable doubt, as follows:

(1)    that Petitioner *knew* that Reyes planned to commit, with malice aforethought, the willful, deliberate and premeditated murder of Francisco;

(2)    that Petitioner *specifically intended* to encourage or facilitate Reyes's unlawful conduct; and

(3)    that Petitioner *affirmatively acted* in a manner so as to aid, promote, encourage or instigate the murder.

*See Juan H.*, *supra*, 408 F.3d at 1276, *citing People v. Beeman*, 35 Cal. 3d 547, 199 Cal. Rptr. 60 (1984).

**B.    State Court's Rejection of Petitioner's Claim**

The California Court of Appeal explained the claim, and its rejection of the claim, as follows:

Fuentes contends that there was insufficient evidence presented to support that he aided and abetted the shooting of Francisco. . . .

A.    *Standard of Review*

Our review of any claim of insufficiency of the evidence is limited. In determining the sufficiency of the evidence, we review the entire record to determine whether the evidence was reasonable, credible, and of solid value from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Catlin* (2001) 26 Cal.4th 81, 139, 109 Cal.Rptr.2d 31, 26 P.3d 357; *People v. Bolin* (1998) 18 Cal.4th 297, 331, 75 Cal.Rptr.2d 412, 956 P.2d 374.) The standard is the same where the prosecution relies primarily on circumstantial evidence. (*People v. Miller* (1990) 50 Cal.3d 954, 992, 269 Cal.Rptr. 492, 790 P.2d 1289.) We resolve all conflicts in the evidence and questions of credibility in favor of

the verdict and indulge every reasonable inference the jury could draw from the evidence. (*People v. Autry* (1995) 37 Cal.App.4th 351, 358, 43 Cal.Rptr.2d 135.)   Reversal on this ground is unwarranted unless "'upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].'" (*Bolin*, at p. 331, 75 Cal.Rptr.2d 412, 956 P.2d 374.)

> B.    *Sufficiency of the Evidence that Fuentes Aided and Abetted the Shooting of Francisco*

Fuentes contends that the evidence was insufficient to support his conviction for aiding and abetting the murder of Francisco.

"A 'person aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator, and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime.' [Citation.]" (*People v. Marshall* (1997) 15 Cal.4th 1, 40, 61 Cal.Rptr.2d 84, 931 P.2d 262.)  "[P]resence at the scene of the crime, while insufficient of itself to make one an aider and abettor, is one factor which tends to show intent.  Other factors which may be considered include the defendant's failure to take steps to prevent the commission of the crime, companionship, and conduct before and after the crime. [Citation.]" (*People v. Pitts* (1990) 223 Cal.App.3d 606, 893, 273 Cal.Rptr. 757.)

As noted by Fuentes, the jury was not instructed on the natural and probable consequences doctrine.  As such, Fuentes

was found liable only if he aided and abetted the first degree murder of Francisco.

We find ample evidence supporting that Fuentes intended to aid and abet the cold-blooded murder of Francisco. There is no dispute that Fuentes was present during the shooting. Furthermore, he made no attempt to stop the shooting and in fact facilitated the shooting by leaning back to give Reyes a clear shot. Although Fuentes characterizes this action as his attempt to merely get out of the way of the gun, we believe this evidence, combined with other evidence presented, was a strong indication of Fuentes's intent to aid and abet the murder.

This additional evidence included that defendants were fellow gang members who spent time together. Prior to the crime, defendants had driven together to the Rojas residence and asked to speak with Martin. [Footnote omitted.] They then drove by Francisco, backed up, and shot him several times. Based on the eyewitness testimony, Reyes reached down to his lap prior to the shooting and grabbed the gun. Fuentes willingly accompanied Reyes, a fellow gang member, in his car in which a loaded firearm was located in the front seat area. Fuentes surely could anticipate that this could mean trouble.

After the shooting, defendants sped off. They were not apprehended until about 15 minutes after the shooting. Fuentes was still in the car. Fuentes did not attempt at any time after the shooting to either exit the Thunderbird or somehow distance himself from the shooting. This was strong evidence that Fuentes was an active participant in the crime.

Finally, the gang expert testified that a gang member would not commit a crime in the presence of another gang member without his knowledge. This would be a form of disrespect. Additionally, after the shooting, defendants continued to correspond with each other. If Fuentes had no knowledge of Reyes's intent to kill Francisco, then, based on the gang expert's testimony, he would no longer communicate with Reyes, who would have disrespected him.

Fuentes errs by concluding that the only evidence that he aided and abetted the shooting was the gang expert's claim that because he was a gang member he would have known about Reyes's feud with Ector and that he would have been "'on the same page'" as Reyes during the shooting. As outlined above, the gang expert testimony, in conjunction with the other evidence presented at trial, supported the jury's finding.

Fuentes makes note that this was a spur-of-the-moment decision to murder Francisco and not a planned activity. We don't believe that this would be fatal to the jury's finding. Even if Reyes did decide to gun down Francisco only after he drove by and saw him, the jury could reasonably infer at that point that Fuentes was well aware of Reyes's intentions. As previously noted, there was a loaded firearm in the car. Based on the gang expert's opinion, a gang member would not commit a crime without the other gang member's knowledge. The jury could reasonably infer that Fuentes knew that Reyes was going to shoot Francisco.

1    A reasonable inference can be made from these

2  circumstances that Fuentes knew Reyes intended to shoot

3  Francisco, and Fuentes assisted him in doing so.

4

5  Lodgment 5 at 23-26.

6

7    **C.    Discussion**

8    The issue is whether the state courts' rejection, which plainly invoked a

9  correct legal standard jibing with *Jackson*, *applied* that standard so unreasonably as to

10 require a habeas reversal, despite the "double deference" rule noted in *Juan H. v. Allen*,

11 *supra*.  This is the rare case in which it did.  The evidence was weak, not "ample" or

12 "strong" as stated by the California Court of Appeal, and it cannot suffice to sustain the

13 conviction.

14    As a preliminary matter, the undersigned notes that it is not bound by

15 California's courts' decisions in determining what kinds of evidence may suffice to show

16 aiding and abetting.  *Juan H.*, 406 F.3d at 1278 n.14 ("[w]e look to California law only to

17 establish the elements of aiding and abetting and then turn to the federal question of

18 whether the California Court of Appeal was objectively unreasonable in concluding that"

19 the evidence was sufficient).  Thus, the Court need not follow *Pitts*, *supra*, whereby

20 California courts may consider, as permissible evidence of aiding and abetting, the alleged

21 abettor's "presence at the scene of the crime, . . . the defendant's failure to take steps to

22 prevent the commission of the crime, companionship, and conduct before and after the

23 crime."

24    Here, the evidence is too weak; a reasonable factfinder could not find all three

25 elements of aiding and abetting beyond a reasonable doubt.  As to the first element of prior

26 knowledge, the principal evidence was the gang expert's opinion that Petitioner, as Reyes's

27 fellow WSV gang member, *either* would have been "on board" with Reyes's plans *or*, if

28 not, would thereafter have distanced himself from Reyes instead of remaining a close

friend.  Such is insufficient evidence to persuade a reasonable factfinder that Petitioner

knew that Reyes planned to murder Francisco, and it was objectively unreasonable for the

state courts to conclude otherwise, for at least two reasons.  First, even if the evidence did

support an inference that Petitioner *generally* knew that Reyes was intending to confront

Francisco, in a car that had loaded firearms inside, the evidence does not reasonably

support a beyond-reasonable-doubt finding that Petitioner *specifically* knew that Reyes

*meant to murder* Francisco.   Second, even the expert himself allowed that Petitioner may

not have known about Reyes's plans; the expert simply explained that, in the expert's

opinion, it was unlikely that a thus-unaware Petitioner thereafter would have remained

friendly with Reyes.  The state courts quite reasonably concluded that the evidence showed

Fuentes, having "willingly accompanied Reyes, a fellow gang member, in his car in which

a loaded firearm was located in the front seat area," "surely could anticipate that this could

mean trouble."  Petitioner was not charged, however, with accompanying someone to cause

trouble; he was charged with aiding and abetting murder.  It is an unreasonable leap to

conclude, from Petitioner's knowledge that trouble was afoot, that the evidence supported

a finding that Petitioner *specifically knew that Reyes planned to kill Francisco*.  And

because the prosecution did not argue a natural-and-probable-consequences theory, and

there were no instructions on such a theory, the prosecution could not obtain a valid

conviction based on Petitioner's mere knowledge that Reyes intended gunplay generally,

as opposed to murder specifically.

       Similarly, the evidence is insufficient to sustain the second and third elements,

namely (2) specific intent and (3) affirmative action taken to aid, promote, encourage or

instigate.  The central evidence in support of both elements was testimony that Petitioner,

the passenger, "leaned back" at the moment Reyes reached across to shoot at Francisco.

This is simply too insubstantial to support a beyond-reasonable-doubt finding for the

prosecution on these two separate elements.  Megan Kahookele, the prosecution's first

witness, testified that Petitioner "was leaning back" at the time of the shooting, and she also

observed that he "was looking back towards me and Francisco, towards the [victim's]

house." *See* Reporter's Transcript (RT) 59. But a passenger may lean back in the car seat only intending to avoid harm himself, or he may have had no intent at all, acting instead on reflex, with the direction of his gaze not necessarily having any bearing on *why* he was leaning back. And "leaning back" hardly seems like an affirmative act to encourage or promote the murder.

Maria Medina, who witnessed the shooting after hearing the screech of the reversing Thunderbird's tires, demonstrated how Petitioner leaned back:

> Q    [by the prosecutor, Mr. Cortez]:
>      Were you able to see what the passenger was doing [at the
>      time of the shooting]?
>
> A:   Yes.
>
> Q:   Can you show us what the passenger did at the time that
>      the driver began to shoot?
>
> A:   Yes. He went toward the back.
>
> MR. CORTEZ:    And may the record reflect that the witness
>      just leaned back in her witness chair?
>
> THE COURT:    Her torso moved decidedly towards the back
>      of the chair.

RT 121. The trial judge's use of the adverb "decidedly" might suggest not only a marked *degree* of "leaning back" but also, or instead, a determined *manner* of doing so, as opposed to a reflexive or frightened impulse – or both. *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 585 (1993). Also, the jury saw Medina's reenactment of how she saw Petitioner leaning back. That demonstration is impossible to evaluate or re-evaluate on habeas. It is at least possible that the manner in which Medina leaned back supported an inference that Petitioner's imitated action was specifically intended to aid Reyes's murder of Francisco. The prosecution has not argued this point, however; nor did the California

1  courts mention it.  In any event, it does little to embellish the evidence supporting

2  Petitioner's conviction.

3          The state courts also looked to Petitioner's post-shooting conduct, again

4  apparently in reliance on the *Pitts* case.  They implicitly, and most reasonably, concluded

5  that Petitioner's failure to distance himself from Reyes and his actions was reprehensible.

6  What this Court cannot find reasonable, however, is the conclusion that Petitioner's post-

7  shooting conduct, even when combined with other evidence, was sufficient to persuade a

8  reasonable juror, beyond reasonable doubt, that *at the time of the shooting* Petitioner

9  intended to facilitate or encourage Reyes's crime *and* that Petitioner took *affirmative* action

10  towards that end, rather than merely passive actions later such as failing to repudiate Reyes.

11  That is what aiding and abetting requires.

12          In sum, the totality of the evidence against Petitioner is simply too lightweight

13  to permit a reasonable factfinder to conclude, beyond reasonable doubt, that Petitioner

14  aided and abetted Reyes's murder of Francisco.  (Although the undersigned believes the

15  evidence to be constitutionally insufficient on all three aiding-and-abetting elements, it

16  need only be insufficient as to one element to justify habeas relief.)

17          This Petition, of course, does not address the conviction of Reyes, the shooter.

18  Nor is the Court ignorant, even in recommending habeas relief, of the grave dangers

19  presented by gang members' activity.  But this case focuses on a narrow, very unusual set

20  of facts in which there simply was not sufficient evidence to convict Petitioner of the

21  *particular* charge brought against him.  The Court cannot grant habeas relief on a *Jackson*

22  claim merely because the Court would have ruled differently as a juror or as a state

23  appellate court judge; different standards apply there.  But even under the "doubly

24  deferential" standard that binds federal habeas courts, the undersigned must conclude that

25  the state courts, in rejecting Petitioner's claim, applied Supreme Court authority

26  unreasonably.  This is the extremely rare case in which a petitioner is entitled to habeas

27  relief on a *Jackson* claim.

28

# V.

## RECOMMENDATION

For the foregoing reasons, IT IS RECOMMENDED that the District Court –

(1)     accept the findings in this Report, and

(2)     enter Judgment (a) granting the Petition for Writ of Habeas Corpus and (b) ordering Petitioner's release from custody, to the extent he is confined solely on the basis of the conviction in this case.


DATED:   October 1, 2009


_____
RALPH ZAREFSKY
UNITED STATES MAGISTRATE JUDGE